UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHERRIE A. CALLAWAY,            )
                                )
    Plaintiff,                 )
  vs.                           )    1:10-cv-01245-LJM-TAB
                                )
MICHAEL J. ASTRUE, *Commissioner* )
*of the Social Security Administration*, )
                                )
    Defendant.                 )

## **ENTRY ON JUDICIAL REVIEW**

Pending before the Court is plaintiff's, Sherrie A. Callaway ("Callaway"), request for judicial review of a decision made by defendant, Michael J. Astrue ("Commissioner"), in his capacity as Commissioner of the Social Security Administration, to deny her Social Security disability benefits from May 6, 2008 forward.

## **I. BACKGROUND**

Callaway was born on June 6, 1958. R. 22.[1] She has a high school education. *Id.* Her past relevant work includes experience as a cannery worker, closing machine tender, food assembler, and custodian. *Id.* At the time of onset of her disability, Callaway was forty-seven years old and working as a custodian at Center Grove High School. *Id.*; *see also* R. 394–95. She has not worked since February 27, 2006. R. 19.

---

[1] For ease of discussion, citations to the administrative record [Dkt. No. 15] will be denoted by "R." followed by the page number.

## A. MEDICAL HISTORY

Callaway has a history of back pain that worsened in late 2005 and early 2006. In November 2005, Callaway had an MRI performed on her lower back. R. 161. The MRI revealed "some degree of congenital change at L5-S1 with a small spinous process and perhaps a pars defect[.]" *Id.* Degenerative changes also were noted at L4-5 and L3-4. *Id.*

In March 2006, Callaway visited Dr. John Lomas ("Dr. Lomas") with complaints of low back, hip, and groin discomfort, primarily on the right side. R. 152. Dr. Lomas noted tenderness over both SI joints as well as the sciatic notch and trochanters. *Id.* Her lower lumbosacral paraspinals were "very tender" on both the left and right sides. *Id.* Dr. Lomas recommended physical therapy and SI joint injections. *Id.* He also prescribed Ultram and took Callaway off of nonsteroidals. *Id.*

In May 2006, Callaway had a consultative physical examination. R. 248–50. In describing her condition, Callaway stated that she was unable to lift more than ten pounds, stand for more than fifteen minutes, or walk for more than a half an hour. R. 248. The consultative examiner noted that Callaway did not require an ambulatory assistive device. *Id.* Her gait appeared normal, and there was no swelling in any of her joints. R. 249. Straight leg raise was seventy-five degrees in both legs. *Id.* She was able to walk on both heels and toes and squat. R. 250. Her muscle strength was normal bilaterally with no muscle weakness or atrophy. *Id.* The consultative physician did note tenderness over Callaway's spine and hips. R. 249.

On June 12, 2006, Callaway was seen by Dr. William L. Driehorst ("Dr. Driehorst") for worsening low back pain. R. 149. Callaway reported that she had been given injections in her sacroiliac joints, but these had provided only temporary relief. *Id.* Dr. Driehorst

noted tenderness over the great trochanters and SI joints. R. 150. He further noted that her forward bending was limited, although her motor, sensory, and neurological exams were intact. *Id.* He diagnosed Callaway with chronic lumbar syndrome. R. 151.

On June 29, 2006, Callaway underwent a discogram. R. 312. The discogram was positive at the L4-5 and L5-S1 levels. R. 313. It revealed significant spread of contrast from center out to the extreme periphery at L5-S1. *Id.* It also revealed significant reproduction of pain at L4-5, somewhat less at L5-S1. *Id.*

On July 17, 2006, Callaway returned to Dr. Lomas, who opined that she could not lift over twenty pounds, was limited in bending, and was unable to perform her normal work duties. R. 361. In another visit with Dr. Lomas on February 14, 2007, he once again noted tenderness in the trochanters, right SI joint, and the left lumbosacral paraspinal area. R. 360. At that time, Callaway rated her pain a 2 out of 10. *Id.* He recommended she take three to four Darvocet on a regular schedule during the day. *Id.*

On March 5, 2007, Callaway had a another MRI performed on her lumbar spine. R. 341. The MRI revealed a disc protrusion on the right side at L5-S1 with some mass effect on the thecal sac and right S1 nerve root, as well as several other small disc protrusions. *Id.* Additionally, an MRI of her cervical spine revealed degenerative changes at C5-6 with mild bilateral neural forminal stenosis and a central protrusion at C6-7 with focus of T2 hyperintensity at the posterior aspect of the disc that might represent an annular tear. R. 342.

During a May 8, 2007 appointment with Dr. Lomas, Callaway reported increased mid and lower back pain. R. 375. She rated her mid back pain as 2 out of 10 and her lower back pain as 3 out of 10. *Id.* She reported that pain increased with activity. *Id.*

On July 11, 2007, Callaway had a CT scan performed on her lumbar spine, which revealed degenerative disc disease primarily at L4-5 and L5-S1. R. 339. The degenerative changes were most pronounced at L5-S1, where there was a right disc herniation producing severe right lateral recess compromise. *Id.* A discogram performed the same day was positive at L4-5 and L5-S1 but negative at L3-4. R. 356–57.

On September 11, 2007, Dr. James Cole ("Dr. Cole") performed surgery on Callaway's back, including fusions at L4-5 and L5-S1 and decompression of the right S1 nerve root. R. 344–45. Post-operatively, Callaway's pain was "well controlled" on oral narcotics, and she was released three days after surgery. R. 355.

On November 1, 2007, during a follow-up visit with Dr. Cole, he noted that Callaway was neurologically intact. R. 366. Callaway was participating in physical therapy and taking two pain pills per day. *Id.* On December 27, 2007, Callaway reported to Dr. Cole that her pain symptoms had temporary gone away but returned following a severe coughing episode. R. 365. Her pain was worse with activity but better with sitting, and Darvocet was effective in lessening her pain. *Id.* Dr. Cole noted that she was neurologically intact but lumbar flexion and extension were only to mid-shin. *Id.*

On January 9, 2008, Callaway reported to Dr. Cole that a Medrol dose pack had helped her pain symptoms. R. 364. She stated that she was participating in a home exercise program and doing squats. *Id.* Two days later, Dr. Cole completed a Physician's Supplemental Disability Report and described Callaway's condition as "improving." R. 314. He restricted her to lifting no more than thirty pounds but stated that, with that lifting restriction, she was able to return to work. *Id.*

On April 30, 2008, Callaway returned to Dr. Cole complaining of lower back, hip, and

4

right foot pain that increased with activity. R. 363. She did not report any leg pain during this visit. *Id.* She also reported that sitting increased the pain in her lower back and hips. *Id.* Although surgery did not completely cure her lower back pain, Callaway reported that it had helped. *Id.*

On May 7, 2008, following another visit by Callaway, Dr. Lomas reported that surgery had helped her back "a fair amount," although she continued to have pain down her leg and into her right foot. R. 388. Callaway had rated her pain in her right foot as a 3 out of 10, stating that pain increased with bending, walking, and lifting. *Id.* Dr. Lomas reported that she had some tenderness in the lumbosacral area over her surgical scar and was hypersensitive to tactile stimulation, but the scar appeared to be healing well without significant swelling or color changes. *Id.* He further reported that lumbar flexion and extension were uncomfortable, and she had some numbness on the sole and outside of her right foot, as well as positive straight leg raising on the right side. *Id.* Dr. Lomas concluded that Callaway was capable of lifting forty pounds but should have some restrictions in bending. *Id.*

On May 16, 2008, Callaway reported to Dr. Lomas that her lower back pain had decreased and her pain medications were helping. R. 371. In June 2008, Callaway continued to report improved pain control on Neurontin and Darvocet, rating her lower back pain a 2 out of 10. R. 370.

On September 17, 2008, Callaway visited Dr. Cole complaining of numbness in her right buttocks and aching in the bottom of her foot with walking. R. 362. Dr. Cole noted that x-rays showed healing post-surgery and that Callaway was doing a home exercise program. *Id.*

5

## B.  APPLICATION FOR BENEFITS AND HEARING

On March 26, 2006, Callaway filed an application for disability benefits.  R. 16, 92. This application was initially denied on June 2, 2006, and again upon reconsideration on July 17, 2006.  R. 16, 46–48, 52–55.  On July 31, 2006, Callaway filed a timely request for an administrative hearing.  R. 16, 44.

On September 26, 2008, a hearing on Callaway's application for disability benefits was held before Administrative Law Judge Andrew Tranovich ("ALJ").  Callaway appeared in person and by counsel.  Also appearing at the hearing were Dr. Paul Schneider ("Dr. Schneider"), a medical expert, and Michael Blankenship ("Blankenship"), a vocational expert.  R. 389.

Callaway testified that problems with lifting and bending precluded her from work. R. 397.  She stated that she could only lift about five pounds without difficulty, and lifting a gallon of milk hurt her wrists and elbows.  R. 398.  She could stand for approximately fifteen minutes before having to move.  *Id.*  Walking is easier, but she could walk for only about twenty minutes before the pain forces her to stop.  *Id.*  Both standing and walking cause pain on her right side, in particular at her right hip and down her right leg into her foot.  *Id.*  She could sit for fifteen to twenty minutes before her right side begins to bother her.  R. 399.  She takes a number of medications, including Lortabs, Lodine, and Paxil.  *Id.*

In describing the activities of a normal day, Callaway testified that she wakes up, takes her medicine, then drinks coffee and watches television. R. 400.  She washes dishes and goes for a walk at night, then she goes to bed at 7:00PM.  *Id.*  She alternates housework with her husband and adult daughter, who lives with her along with Callaway's two grandchildren.  *Id.*  Although Callaway occasionally does dishes, she does not vacuum

6

or mop.  *Id.*  She washes laundry, but her daughter puts the clothing in the dryer and removes it.  *Id.*  She tries to get out of the house at least two days a week, including going to the store with family members.  R. 401.  However, she has problems walking around the store, so she sits and waits on her family members.  *Id.*  She carries light groceries.  *Id.*  Callaway drives to the doctor or the store, but she does not "feel comfortable" driving alone and usually has her daughter accompany her.  *Id.*  Her medications make her tired.  *Id.*  She spends approximately two hours a day "resting," which usually involves lying in bed.  R. 398, 401–02.

Dr. Schneider, a board certified orthopedic surgeon, testified as an independent medical expert.  R. 407.  Dr. Schneider noted that Callaway's medical records evidenced degenerative disc disease since at least February of 2006.  R. 408.  He did not notice any objective medical evidence supporting Callaway's complaints of hip pain.  *Id.*  He noted that on May 7, 2008, Dr. Lomas recommended limiting Callaway to forty pounds lifting and limiting her bending.  R. 388, 410.  Other than the diagnosis of degenerative disc disease, Dr. Schneider opined that there were no other clinical findings in Callaway's medical records meeting the requirements of Listing 1.04A or any other Listing.  R. 411.  Dr. Schneider further noted that, apart from Dr. Lomas's May 7, 2008, recommendations, no other physician described work restrictions for Callaway.  *Id.*

Dr. Schneider disagreed with two previous reviewing physicians in Callaway's file, both of whom opined that her impairments were non-"severe."  R. 412.  He stated that he believed Callaway's impairments qualified as "severe."  *Id.*  Dr. Schneider further opined that, although she would have been "less than sedentary" prior to May 6, 2008, following her back surgery, Callaway had reached maximum medical improvement.  R. 415.

However, he did opine that Callaway could still have some residual numbness. R. 420.

Describing limitations to Callaway's residual functional capacity ("RFC") following her surgery, Dr. Schneider stated that the medical evidence warranted a lifting restriction of twenty-five pounds, two to four hours of standing or walking per work day, and six to eight hours of sitting with a break every hour or two at the work site. R. 415–17. Additionally, he recommended limiting pushing and pulling with the right lower extremity to ten to twenty pounds, as well as limiting bending to only occasional. R. 417–19. He stated that Callaway should not be climbing ladders, ropes, scaffolds, although she could occasionally climb stairs, and that she should avoid heights, moving machinery, vibration, kneeling, crouching, or crawling. R. 418–20.

Blankenship, a certified rehabilitation counselor, testified as a vocational expert. R. 421. He opined that Callaway's previous employment as a cannery worker qualified as a light, unskilled job according to the Department of Labor, although he indicated that Callaway's testimony regarding the weight she had to lift might increase the job to a medium exertion level. R. 422–23. Her job as a janitor was classified as medium and semi-skilled, although he once again noted that this classification could change based on the weight she was required to carry. R. 423.

The ALJ asked Blankenship to consider a hypothetical worker with Callaway's education and work experience, as well as the limitations indicated by Dr. Schneider. R. 424–25. Blankenship opined that all of Callaway's past relevant work would be precluded because of the limitation on standing or walking for more than two hours. R. 425. Prior to May 5, 2008, Blankenship further opined that the hypothetical worker would be precluded from all work. R. 426. However, given Dr. Schneider's proposed limitations after May 6,

2008, Blankenship indicated that there would be unskilled, light exertion jobs that the hypothetical worker could perform, including receptionist, information clerk, general office worker, and administrative support worker. *Id.* Blankenship admitted that, if in addition to the limitations provided by Dr. Schneider, the hypothetical worker had to take a thirty minute break every two hours, all work would be precluded. R. 427.

### C. THE ALJ'S DECISION

On December 19, 2008, the ALJ issued a decision on Callaway's disability claim. *See generally* R. 14–27. The ALJ broke Callaway's claim down into two distinct time periods: from the onset date until May 5, 2008 ("Period One"), and from May 6, 2008 forward ("Period Two"). R. 16.

For steps one and two, the ALJ determined that the analysis was the same for both time periods. At step one, the ALJ found that Callaway has not engaged in substantial gainful activity since February 27, 2006, the onset date of her disability. R. 19. At step two, the ALJ found that during both periods, Callaway's chronic back pain, degenerative disc disease of the cervical and lumbar spine, lumber facet arthropathy, and right lower extremity radiculopathy qualified as "severe" impairments. R. 20–21.

The ALJ then evaluated steps three, four, and five for each time period. During Period One, at step three, the ALJ determined that Callaway's impairments did not meet or medically equal a Listing. R. 21. Turning to Callaway's RFC during Period One, the ALJ determined that Callaway could perform less than sedentary work. *Id.* She could occasionally lift and carry ten pounds, either stand or walk one hour in an eight-hour work day, and sit about two hours a day. *Id.* At steps four and five, the ALJ determined that

9

Callaway's RFC during Period One rendered her unable to either return to her past relevant work or adjust to any other work available in the national economy. R. 21–22. The ALJ determined that Callaway was disabled during Period One. R. 23.

Turning to Period Two, the ALJ concluded that medical improvement occurred as of May 6, 2008, following surgery. *Id.* The ALJ concluded based on Dr. Schneider's testimony that Callaway's impairments did not meet or equal a Listing during Period Two. *Id.* Addressing Callaway's RFC during Period Two, the ALJ concluded that she could perform light work. *Id.* She could occasionally lift and carry thirty pounds and frequently lift and carry twenty-five to twenty-nine pounds. *Id.* She could either stand or walk two hours in an eight-hour work day without an ambulatory assistive device. *Id.* She could sit six to eight hours a day, provided that she would be able to alternate between sitting and standing for five minutes every one to two hours. *Id.* Although she could push or pull thirty pounds with her lower left extremity, her right lower extremity was restricted to ten to twenty pounds. *Id.* She could climb ramps and stairs but not ladders, ropes, or scaffolds. *Id.* She could occasionally balance, stoop, and bend but never kneel, crouch, or crawl. R. 24. Additionally, she should avoid all work hazards, including heights, moving machinery, and vibratory tools. *Id.*

In light of the RFC determination during Period Two, the ALJ concluded at step four that Callaway was still unable to return to her past relevant work due to its "exertional demands." R. 26. At step five, the ALJ determined that Callaway's "ability to perform all or substantially all of the requirements of [light] work has been impeded by additional limitations." *Id.* However, based on Blankenship's testimony, the ALJ determined that based on her age, education, experience, and RFC, Callaway could perform some work.

*Id.* In particular, the ALJ pointed to jobs as a receptionist/information clerk, general office worker, and office/administrative support as light, unskilled jobs that Callaway could perform even with her limitations. *Id.* Because sufficient numbers of these positions exist in Indiana, the ALJ concluded that Callaway was not disabled during Period Two. *Id.*

On September 10, 2010, the Appeals Council declined to review the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner. R. 5–7; *see also Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). On October 1, 2010, Callaway filed this action pursuant to 42 U.S.C. § 405(g) seeking review of the Commissioner's decision. Dkt. No. 1.

The Court includes additional facts below as necessary.

## II.  LEGAL STANDARD

To be eligible for Social Security benefits, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1) If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3) If the claimant has an impairment that meets or is equal to an impairment listed in [20 C.F.R. § 404, Subpart P, Appendix 1] ("Listing") and satisfies the

11

duration requirement, the claimant is disabled.

4) If the claimant can still perform the claimant's past relevant work given the claimant's [RFC], the claimant is not disabled.

5) If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, shifting to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See, e.g.*, *Hendersen*, 179 F.3d at 512. This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In order for remand to be required, the ALJ's error must have the potential to effect the ALJ's ultimate disability determination. *See Cottrell v. Astrue*, No. 1:10-cv-941, 2011 WL 1343904, at *4 (S.D. Ind. Apr. 6, 2011) (citing *Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003)) (applying doctrine of harmless error to Social Security administrative determinations).

The ALJ "need not evaluate in writing every piece of testimony and evidence

submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to follow the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1995).

## III. DISCUSSION

The ALJ determined that Callaway was disabled during Period One. R. 23. Callaway's challenge to the ALJ decision, therefore, is limited to the ALJ's conclusion that she was not disabled during Period Two. In particular, Callaway contends that the ALJ's determinations at steps three and five of the five-step process are contrary to law and not supported by substantial evidence.

### A. LISTING 1.04A

Callaway first contends that the ALJ erred in determining that her spinal impairments failed to meet or equal Listing 1.04A for Disorders of the Spine ("Listing 1.04A"). If a claimant's impairments meet or equal a specific impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1, for a sufficient duration, the claimant is entitled to a finding of disability. 20 C.F.R. § 404.1520(a)(4). Listing 1.04A comprises:

13

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord [with e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpart P, Appendix 1, 1.04A. To meet or equal a listed impairment, a claimant must satisfy all of the criteria of the listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The claimant bares the burden of proving that her condition meets or equals a listed impairment. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

In finding that Callaway's condition did not meet or equal Listing 1.04A, the ALJ noted that "[c]linical findings revealed no nerve root involvement,[2] sensory or reflex loss, spinal arachnoiditis, or ambulatory limitations[.]"[3] R. 21, 150. Further, he relied on the testimony of the Dr. Schneider, the impartial medical expert, who concluded that Callaway's condition failed to meet or equal Listing 1.04A. R. 23, 411.

Although the ALJ's discussion of whether Callaway meets or equals Listing 1.04A is not as detailed as one might hope, the Court concludes that it is sufficiently supported

---

[2] The report from Callaway's March 10, 2009, MRI indicates "nerve root or cord compression" and "mild spinal canal stenosis," undermining the ALJ's conclusion that there were no clinical findings of "nerve root involvement." R. 302. However, the Court may not consider this evidence because it was not presented to the ALJ, having been obtained after the hearing, and the Appeals Council denied review of the ALJ's decision. *Eads v. Secretary of Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993). Although this evidence may effect a new application for benefits, it has no bearing on whether the ALJ's December 2008 decision was supported by substantial evidence.

[3] The ALJ is correct that Callaway's condition fails to meet the requirements of Listings 1.04B and 1.04C. Listing 1.04B requires evidence of spinal anachoiditis. 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.04B. Listing 1.04C requires evidence of ambulatory limitations. *Id.* at 1.04C. Callaway does not dispute that she meets neither of these requirements. *See* R. 21.

14

by substantial evidence. In order for remand to be required, Callaway must point to evidence that each requirement of Listing 1.04A is present in her condition. *Ribaudo*, 458 F.3d at 583. Although Callaway does point to evidence of positive straight leg raising in May 2008 that was not addressed by the ALJ—*see* R. 388—as well as evidence of persistent discomfort, numbness, and limitations in flexion and extension—*see* R. 362, 388—she has not pointed to evidence for all requirements of Listing 1.04A. In particular, during Callaway's consultative physical examination in May 2006, the consulting physician noted there was no muscle weakness or atrophy, although there was some tenderness over Callaway's spine and hips. R. 250. Callaway has pointed to no medical evidence in the record contradicting this statement. As atrophy or muscle weakness is required by Listing 1.04A, the Court concludes that the ALJ's finding that Callaway fails to meet Listing 1.04 is supported by substantial evidence.

### B. CREDIBILITY DETERMINATION

Callaway further contends that the ALJ erred in his credibility determination by failing to account for the factors of Social Security Ruling 96-7 and instead focusing exclusively on the "objective medical evidence." Credibility determinations by an ALJ are entitled to deferential review, particularly since the ALJ had the opportunity to observe the claimant in making the credibility determination. *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009). The Court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008). Only when the ALJ's determination "lacks any explanation or support" that the Court may declare it "patently wrong" and reverse the ALJ's decision. *Id.* (quoting *Jens v. Barnhart*, 347 F.3d 209, 213

(7th Cir. 2003)).

An ALJ must make a specific determination as to the credibility of a claimant's testimony regarding her own condition and functional limitations. SSR 96-7p. In making a credibility determination, an ALJ is required to account for the following seven factors:

1) The claimant's daily activities;

2) The location, duration, frequency, and intensity of claimant's pain or other symptoms;

3) Precipitating and aggravating factors;

4) The type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain or other symptoms;

5) Treatment, other than medication, that claimant receives or has received for pain or other symptoms;

6) Any measures claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on one's back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

7) Other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.*; 20 C.F.R. §§ 404.1529, 416.929. "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p.

In testimony about her functional limitations, Callaway testified that she could not lift more than five pounds, and she could only stand for fifteen minutes at a time, walk for fifteen to twenty minutes, and sit for fifteen to twenty minutes before experiencing uncomfortable pain in her right leg and foot. R. 397–99. She further testified that bending and lifting "inflam[es]" her hips and SI joints. R. 397. When asked to describe her daily

16

activities, Callaway stated that she washes dishes twice a week and washes clothes. R. 400. She does not load clothes in and out of the dryer, mop, or vacuum. *Id.* She "tr[ies] to get out" at least twice a week, including trips to the store with her daughter and grandchildren, although she has problems walking in the store and ends up sitting and waiting on them. R. 401. Callaway does drive to the doctor and the store, although she often makes her daughter accompany her. *Id.* Regarding side effects of her medications, she noted that they make her "tired." *Id.*

The ALJ found Callaway "not . . . fully credible regarding her level of pain." R. 25. He further noted that "the objective medical evidence does not substantiate the extreme functional deficits to which she testified." *Id.* In support of his conclusion, the ALJ noted that Callaway reported a decrease in pain to her treating physicians following decompression surgery. R. 25, 370–71, 387. Additionally, the ALJ noted that Callaway takes regular walks, drives, and attends to her own personal hygiene. R. 25. He also addressed effects of her medication, noting that she exhibits no major side effects, and her non-medication treatments, including physical therapy. *Id.* The ALJ concluded that Callaway would still have some work restrictions—including a thirty pound lifting restriction—but that these restrictions would not preclude her from performing light work. *Id.* The ALJ further relied on both Callaway's treating physician and the impartial medical expert, both of whom agreed that Callaway would be able to perform light work with a lifting restriction. *Id.* While the ALJ may not rely on objective medical evidence to ignore a claimant's subjective complaints, he may find a claimant to be less credible when her reported symptoms contradict the medical evidence and other evidence about her daily living activities. *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005). The Court

concludes that the ALJ's credibility determination is not "patently wrong" and not, therefore, not a sufficient basis for remand.

## C. STEP FIVE DETERMINATION

Lastly, Callaway argues that the ALJ's conclusion at step five is not supported by substantial evidence. At step five, the ALJ found that Callaway could perform light work. R. 23. He noted that she should never climb ladders, ropes, or scaffolds; never kneel, crouch, or crawl; and avoid "all work hazards such as height, moving machinery, and vibratory tools." R. 23–24. Additionally, he placed a thirty-pound lifting restriction and noted that she will require the opportunity to alternate between sitting and standing for five minutes at her work station. R. 23.

Callaway contends that the hypothetical question posed to Blankenship, the vocational expert, failed to incorporate all the restrictions noted by Dr. Lomas and Dr. Cole. When an ALJ relies on the testimony of a vocational expert, the hypothetical question posed to the expert must incorporate all of the limitations supported by medical evidence in the record. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). However, the "ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007).

The Court concludes that the ALJ's decision at step five does not require remand. As discussed above, the ALJ determination as to Callaway's credibility was not patently wrong. Because the ALJ did not find Callaway's testimony as to her limitations credible, he was not required to incorporate those limitations into the hypothetical posed to Blankenship. *Id.* Callaway points to no specific limitations proposed by either Dr. Lomas

or Dr. Cole apart from Dr. Lomas's May 2008 recommendation of a forty-pound lifting restriction and limited bending and Dr. Cole's January 2008 recommendation of a thirty-pound lifting restriction. R. 388. The ALJ incorporated these restrictions into his RFC determination and the hypothetical posed to Blankenship. R. 23, 415–16, 418–19, 425. In fact, the ALJ imposed a thirty-pound lifting restriction, the most conservative recommendation from Callaway's treating physicians. *Id.* at 23. The Court concludes that the ALJ's determination at step five is supported by substantial evidence.

## IV. CONCLUSION

For the reasons discussed herein, the Commissioner's decision is **AFFIRMED**.

IT IS SO ORDERED this 22nd day of March, 2012.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com